UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **EDCV 23-2407 JGB (Ex)** | Date | February 18, 2025 |
|---|---|---|---|
| Title | *Isiah Sheppard, et al. v. Fantasia Trading LLC* | | |

| Present: The Honorable | JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE |
|---|---|

| MAYNOR GALVEZ | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Present | None Present |

**Proceedings:**   Order (1) GRANTING Defendant Fantasia Trading LLC's Motion to Dismiss (Dkt. No. 46); (2) GRANTING Defendant Anker Innovation Limited's Motion to Dismiss (Dkt. No. 47); (3) VACATING the February 24, 2025 Hearing; and (4) DIRECTING the Clerk to Close the Case (IN CHAMBERS)

    Before the Court are: (1) Defendant Fantasia Trading LLC's motion to dismiss, or in the alternative to strike class allegations, pursuant to Federal Rules of Civil Procedure 12(b)(6) and 12(f) ("Fantasia Motion," Dkt. No. 46); and (2) Defendant Anker Innovations Limited's motion to dismiss, or in the alternative to strike class allegations, pursuant to Federal Rules of Civil Procedure 12(b)(2), 12(b)(5), 12(b)(6), and 12(f) ("Anker Motion," Dkt. No. 47) (jointly, the "Motions").  The Court determines these matters appropriate for resolution without a hearing.  See Fed. R. Civ. P. 78; L.R. 7-15.  After considering the papers filed in support of and in opposition to the Motions, the Court **GRANTS** the Motions and **DISMISSES** Plaintiffs' third amended complaint ("TAC," Dkt. No. 43) **WITHOUT LEAVE TO AMEND**.  The Court **VACATES** the February 24, 2025 hearing.

### I.   BACKGROUND

    On November 27, 2023, Plaintiffs Isiah Sheppard, Bernabe Benitez, Helene Lauzier-Meyer, and Hilscio Rivera (collectively, "Plaintiffs") filed a class action complaint against Defendant Fantasia Trading LLC ("Fantasia").  ("Complaint," Dkt. No. 1.)  On January 22, 2024, Fantasia moved to dismiss the Complaint.  ("Fantasia's First MTD," Dkt. No. 12.)  Plaintiffs filed a first amended complaint on February 12, 2024.  ("FAC," Dkt. No. 14.)  On February 15, 2024, the Court denied Fantasia's First MTD as moot because Plaintiffs had filed the FAC.  (Dkt. No. 15.)

On February 26, 2024, Fantasia filed a second motion to dismiss. ("Fantasia's Second MTD," Dkt. No. 16.) On April 25, 2024, the Court granted Fantasia's Second MTD and gave Plaintiffs leave to amend their complaint. ("Fantasia's Second MTD Order," Dkt. No. 23.) On May 13, 2024, Plaintiffs timely filed their second amended complaint against Defendants Fantasia and Anker Innovations Limited ("Anker") (jointly, "Defendants"). ("SAC," Dkt. No. 24.)

On May 28, 2024, Fantasia filed a third motion to dismiss, and on June 14, 2024, Anker filed a motion to dismiss. ("Defendants' MTDs," Dkt. Nos. 28, 31.) On July 26, 2024, the Court granted Defendants' MTD and gave Plaintiffs leave to amend their complaint. ("Defendants' MTD Order," Dkt. No. 42.) Because the SAC represented Plaintiffs' third attempt at alleging violations of Illinois's Biometric Information Privacy Act ("BIPA"), 740 ILCS §§ 14/15(b) ("Section 15(b)") and 14/15(a) ("Section 15(a)"), the Court warned Plaintiffs that a future failure to properly state Section 15(b) and Section 15(a) claims will result in dismissal without leave to amend. (See id. at 13-15.) On August 5, 2024, Plaintiffs timely filed the TAC. (TAC.) The TAC alleges two causes of action against Defendants: (1) violation of Section 15(b); and (2) violation of Section 15(a). (See id.)

On September 18, 2024, Anker filed the Anker Motion. (Anker Motion.) The same day, Fantasia filed the Fantasia Motion. (Fantasia Motion.) On October 2, 2024, Plaintiffs opposed the Motions. ("Opposition," Dkt. No. 50.) Defendants replied on October 7, 2024. ("Reply," Dkt. No. 51.) On October 8, 2024, Plaintiffs filed a declaration of attorney Stefan Bogdanovich, explaining that the Opposition was filed late, per this Court's Local Rules, due to a calendaring error.[1] ("Bogdanovich Decl.," Dkt. No. 52.)

//
//

## II. FACTUAL ALLEGATIONS

---

[1] Pursuant to this Court's Local Rules, Plaintiffs should have filed an opposition or a notice of non-opposition to the Motions on or before September 30, 2024. See L.R. 7-9 ("Each opposing party shall, . . . not later than twenty-one (21) days before the date designated for the hearing of the motion . . . , serve upon all other parties and file with the Clerk either (a) the evidence upon which the opposing party will rely in opposition to the motion and a brief but complete memorandum which shall contain a statement of all the reasons in opposition thereto and the points and authorities upon which the opposing party will rely, or (b) a written statement that that party will not oppose the motion."). The Court admonishes Plaintiffs and warns that "the failure to file any required document, or the failure to file it within the deadline, may be deemed consent to the granting or denial of the motion . . . ." L.R. 7-12. However, because Defendants were not overly prejudiced by Plaintiffs' failure to comply with this Court's Local Rules—as evidenced by their timely filed Reply—the Court will not "dismiss all claims with prejudice on that basis alone" as requested by Defendants. (See Reply at 1.)

Plaintiffs allege the following facts, which are assumed to be true for the purposes of the Motions.  See Am. Fam. Ass'n, Inc. v. City & Cnty. of San Francisco, 277 F.3d 1114, 1120 (9th Cir. 2002).

**A.      Parties**

Plaintiff Isiah Sheppard ("Sheppard") is a resident of Cook County, Illinois and works as an Uber Eats and DoorDash delivery driver making deliveries to customers' homes.  (TAC ¶ 12.)  As part of Sheppard's regular delivery process, he walks to the front door of a customer's residence to make a delivery.  (Id.)  On multiple deliveries, Defendants' security system captured scans of Sheppard's face and/or hands.  (Id.)  Sheppard has a publicly available Facebook account which is searchable by his name and which features photos of himself.  (Id.)

Plaintiff Hilscio Rivera ("Rivera") is a resident of Cook County, Illinois and works as an Amazon, DoorDash, Postmates, Dispatch, Veho, AxleHire, and Roadie delivery driver making deliveries to customers' homes.  (Id. ¶ 13.)  As part of Rivera's regular delivery process, he walks to the front door of a customer's residence to make a delivery.  (Id.)  On multiple deliveries, Defendants' security system captured scans of Rivera's face and/or hands.  (Id.)  Rivera has publicly available Facebook and Twitter accounts which are searchable by his name and which feature photos of himself.  (Id.)

Plaintiff Helene Lauzier-Meyer ("Lauzier-Meyer") is a resident of Sangamon County, Illinois and works as a DoorDash and Spark delivery driver making deliveries to customers' homes.  (Id. ¶ 14.)  As part of Lauzier-Meyer's regular delivery process, she walks to the front door of a customer's residence to make a delivery.  (Id.)  On multiple occasions, Defendants' security system captured scans of Lauzier-Meyer's face and/or hands.  (Id.)  Lauzier-Meyer has a publicly available Facebook account which is searchable by her maiden name and which features images of herself.  (Id.)

Plaintiff Bernabe Benitez ("Benitez") is a resident of Lake County, Illinois and works as an UberEats delivery driver who makes deliveries to customers' homes.  (Id. ¶ 15.)  As part of Benitez's regular delivery process, he walks to the front door of a customer's residence to make a delivery.  (Id.)  On multiple occasions, Defendants' security system captured scans of Benitez's face and/or hands.  (Id.)  Benitez has publicly available Facebook and TikTok accounts which are searchable by his last name and which feature images of himself.  (Id.)

Defendant Fantasia is a Delaware corporation with its principal place of business in Ontario, California.  (Id. ¶ 16.)  Fantasia is a wholly owned subsidiary of Anker, under Anker's control and direction.  (Id.)  It markets and distributes electronic devices under the brand Anker, including eufy.  (Id.)  Defendant Anker is a Chinese company with its principal place of business in Hong Kong.  (Id. ¶ 17.)  Anker designs, manufactures, and distributes eufy camera products throughout the United States, including Illinois and California.  (Id.)  It offers the eufy Security App for use with eufy cameras.  (Id.)  eufy is a home security technology company that offers security cameras supported by high-quality video and artificial intelligence ("AI")

monitoring.  (Id. ¶ 18.)  On its "About Us" webpage, eufy lists "Anker Innovations" as the company that owns it.  (Id.)  The bottom of the webpage contains hyperlinks to "various legal documents," which also list "Fantasia Trading LLC."  (Id.)  eufy's Terms of Service similarly list Anker and Fantasia as "affiliated companies" and purports to bind both companies into an agreement with users of the "[e]ufy Security App and devices, eufy Baby App and devices, eufy Clean App and devices, [and] [e]ufyLife App and devices."  (Id.)

Anker manufactures its products overseas and imports them into California where they are then distributed by Fantasia in Ontario, California.  (Id. ¶ 23.)  Specifically, Anker works with Fantasia to import all, or virtually all, of its eufy cameras into the United States through the port complex of Los Angeles and Long Beach—together known as the San Pedro Bay Port Complex.  (Id.)  According to an aggregator of publicly available bills of lading, from 2019 to 2024, Fantasia recorded 5,607 bills of lading.  (Id. ¶ 24.)  Fantasia's top ports of unlading in the United States is the San Pedro Bay Port Complex with 5,364 bills of lading—representing 95.7% of all Fantasia's bills of lading during that period.  (Id.)  A search in the database for "Camera" under Fantasia's imported commodities reveals 370 bills of lading.  (Id. ¶ 26.)  All but six of those 370 bills show imports to the San Pedro Bay Port Complex; none of the remaining six bills that went to other ports reference the eufy brand.  (Id.)  In short, all, or at least the vast majority, of the specific eufy cameras that collected facial geometry scans of each of the Plaintiffs' faces in Illinois were first manufactured overseas by Anker and imported through the Ports of Los Angeles and Long Beach.  (Id. ¶ 28.)

**B.     eufy's Technology**

eufy sells 17 different security camera models, available in 36 different configurations, all of which come equipped with on-device AI monitoring capabilities.  (Id. ¶ 32.)  These cameras include multiple models of doorbell cameras, exterior mounted and floodlight cameras, and a series of base stations.  (Id.)  eufy's AI technology is categorized as either "Local AI" or "BionicMind AI."  (Id. ¶ 33.)  Together, the AI technologies offer homeowners several different detection features, depending on the user's subscription and base station.  (Id.)  "Local AI" (eufy's on-device AI mechanism) uses an "embedded AI chip" built into the cameras which provides "local, safe, and intelligent detection."  (Id. ¶ 34.)  "BionicMind AI" has "the ability to recognize similar faces, body shapes/positions, different objects, and even human behavior with is machine self-learning system."  (Id. ¶ 35.)  The system conducts this analysis "locally on the base station" and is added to an already operating eufy system by incorporating the proper base station.  (Id.)

eufy's intelligent detection arises through six unique features: (1) a human detection feature where the system tries "to detect objects similar to the human shape and filter out other objects like cars and animals for motion alerts"; (2) facial detection where the system tries to "detect and screen faces shown in the video image"; (3) human facial recognition where the system tries to "recognize faces in the video image and identify the person for [the homeowner]"; (4) pet detection where the system tries "to detect pets which appear in the video image"; (5) crying detection where the system tries "to detect crying and will notify [the

homeowner] if necessary"; and (6) vehicle detection where the system "will catch up with the user's vehicle in the backyard or driveway." (Id. ¶ 36.)

Generally, the kind of base station the homeowner uses affects which version of eufy's AI the homeowner can turn on. (Id. ¶ 37.) For example, the base level "Original HomeBase" allows all AI-incorporated cameras and battery-operated video doorbells to use the human detection and facial recognition features. (Id.) The "HomeBase 3," alternatively, allows the homeowner to deploy each AI recognition feature. (Id.) "HomeBase E" and "HomeBase 2" allow the homeowner to use just the human detection and facial recognition detection features. (Id.) Although the homeowner has, in some instances, a choice of which base station to pair with their eufy camera, eufyCam (eufyCam, eufyCam E, eufyCam 2, eufyCam 2C, eufyCam 2 Pro, eufyCam 2C Pro) must be used with HomeBase, which ensures that EufyCam and EufyCam2 cameras are AI-capable. (Id. ¶ 38.) Likewise, eufyCam 3 comes included with HomeBase 3. (Id.)

However, unlike the rest of the products, eufy's wired video doorbells allow the homeowner to use the human- and facial-detection features without needing a base station. (Id. ¶ 39.) Regardless of which camera is used, eufy's Local AI system is remarkably accurate. (Id. ¶ 40.) As eufy boasts, its on-camera AI human-detection feature "accurately detect[s] humans and vehicles" 95% of the time. (Id.) Likewise, users can enhance their system's AI capabilities by adding eufy's BionicMind AI-equipped base stations to their security systems. (Id.) eufy's BionicMind AI system, which can be added simply by connecting a new base station, "uses self-learning algorithms after every facial and body shape scan to improve recognition accuracy to more than 99.9% over time—no matter what [the subject is] wearing and how [the subject] approach[es] the camera." (Id.)

Human detection, available for "Local AI" and "BionicMind AI" users, "detects and captures motion . . . for accurate object classification." (Id. ¶ 41.) The technology "works in two steps." (Id. ¶ 42.) First, "[w]hen the camera detects motion in its field of view, the AI engine analyzes the figure to determine if it is a human being or not." (Id.) Second, "if the captured face meets the AI engine's analysis parameters, the AI engine will try to capture the face and then send a notification to the user." (Id.) This step allows the system to use the captured biometric identifiers in two scenarios. (Id.)

Once stored with the proper base station connected, eufy's "cross camera tracking" feature will "automatically compile shots of the same event and person and organize them chronologically into a single clip" if an event occurs within the view of multiple cameras. (Id. ¶ 43.) As eufy explains, "[w]hen the same individual appears across multiple cameras within a specified timeframe, the system automatically locates and merges these footage [sic] into a single video" so that the homeowner can "easily review the entire activity of that specific individual in a single video." (Id. ¶ 44.) To piece the footage together, the BionicMind base station "analyzes the video content and stitches it together in-real [sic]" time and, "[a]fter each camera has finished recording and saving videos to [the base station], [it] re-analyzes the video content for splicing." (Id. ¶ 45.) Cameras that are not compatible with BionicMind base

stations cannot stitch images together in real time and, instead, analyze saved video after recording has ended.  (Id.)  The homeowner then receives a notification alerting them that the device has either detected an already catalogued face, like a friend, or a new, unknown visitor like a delivery driver.  (Id. ¶ 46.)

eufy is capable of making these identifications by storing and analyzing biometric-identifier data so the AI can "keep learning the details of the characteristics of people, including different angles of the face and bodies" to "help the AI recognize a person more accurately and quickly."  (Id. ¶ 47.)  That data is then accessible to the user via the eufy Security App.  (Id.)  Eufy "readily admits" that "[t]he Cross-Camera Tracking function depends on a human feature recognition algorithm that determines the similarity of an individual's appearance in two videos to stitch them together.  Even if the face is not visible in the video, videos of similar-looking individuals are still identified and stitched together."  (Id. ¶ 53.)

C.      eufy's Data Management Practices

The eufy cameras' labels state that "[a]ll your footage is securely stored locally[,] [e]nsuring the videos you record are for you and only you."  (Id. ¶ 50.)  Consumers who purchase a eufy camera must use the eufy Security App smartphone application, which allows them to access their cameras, view live and historical video feeds, and adjust the cameras' settings.  (Id. ¶ 51.)  The app allows users to access and review specific data points, such as scanned faces.  (Id. ¶ 52.)

Although eufy represents that its AI and biometric collections are stored locally, as recently as December 2022, "it was revealed that . . . eufy was sending data from its cameras to the cloud, despite [marketing that] . . . its cameras and video doorbells [used] local-only recording . . . [after] a security researcher found that the company was uploading images from the cameras to AWS servers alongside facial recognition data."  (Id. ¶ 54.)  Specifically, in testing one of eufy's devices, the researcher found that "[t]he doorbell's camera was uploading facial recognition data from the camera to [e]ufy's cloud servers with identifiable information attached, and that this data wasn't actually removed from [e]ufy's servers when the related footage had been deleted from the [e]ufy app."  (Id.)  The researcher also expressed concern that "[e]ufy could link footage collected from different cameras and apps to individuals using facial recognition."  (Id.)  AWS Servers are servers offered by Amazon.com to companies like Defendants as "low-cost ways to deliver their websites and web applications" to users.  (Id. ¶ 55.)

Once eufy's data management practices were discovered, eufy acknowledged in a January 2023 press release that "[p]reviously, we [had] one device, the Video Doorbell Dual, that sent and stored an image of the user to our secure cloud. . . .  First, the purpose of sending a user image from the eufy App to our devices is to give the local facial recognition software a baseline to run its algorithm."  (Id. ¶ 58.)  However, it has since been revealed that all eufy devices were storing facial thumbnails on eufy's cloud servers.  (Id.)  eufy then stated that they were "revising the push notifications option language in the eufy Security app to clearly detail

that push notifications with thumbnails require preview images that will be temporarily stored in the cloud." (Id. ¶ 59.)

### III. LEGAL STANDARD

#### A. Rule 12(b)(2)

"The general rule is that personal jurisdiction over a defendant is proper if it is permitted by a long-arm statute and if the exercise of that jurisdiction does not violate federal due process." Pebble Beach Co. v. Caddy, 453 F.3d 1151, 1154-55 (9th Cir. 2006) (citing Fireman's Fund Ins. Co. v. Nat. Bank of Coops., 103 F.3d 888, 893 (9th Cir. 1996)). Because California authorizes jurisdiction to the fullest extent permitted by the Constitution, see Cal. Code Civ. P. § 410.10, the only question the Court must ask in this case is whether the exercise of jurisdiction over Defendant would be consistent with due process. Harris Rutsky & Co. Ins. Servs., Inc. v. Bell & Clements Ltd., 328 F.3d 1122, 1129 (9th Cir. 2003).

The Fourteenth Amendment's Due Process Clause permits courts to exercise personal jurisdiction over any defendant who has sufficient "minimum contacts" with the forum that the "maintenance of the suit does not offend traditional notions of fair play and substantial justice." Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945). There are two recognized bases for exercising personal jurisdiction over a non-resident defendant: (1) "general jurisdiction," which arises where defendant's activities in the forum state are sufficiently "substantial" or "continuous and systematic" to justify the exercise of jurisdiction over him in all matters; and (2) "specific jurisdiction," which arises when a defendant's specific contacts with the forum give rise to the claim in question. See Helicopteros Nacionales de Colombia S.A. v. Hall, 466 U.S. 408, 414–16 (1984).

Where, a court decides a motion to dismiss for lack of personal jurisdiction without an evidentiary hearing, the plaintiff need only make a prima facie showing of jurisdictional facts to survive the motion to dismiss. Ballard v. Savage, 65 F.3d 1495, 1498 (9th Cir. 1995). The plaintiff's version of the facts is taken as true for purposes of the motion if not directly controverted, and conflicts between the parties' affidavits must be resolved in plaintiff's favor for purposes of deciding whether a prima facie case for personal jurisdiction exists. AT&T v. Compagnie Bruxelles Lambert, 94 F.3d 586, 588 (9th Cir. 1996).

#### B. Rule 12(b)(5)

Under Rule 12(b)(5), a party may seek dismissal of a complaint for insufficient service of process. Fed. R. Civ. P. 12(b)(5). "Service of process is a prerequisite for personal jurisdiction over a defendant." C&SM Int'l v. Prettylittlething.com Ltd., 2019 WL 7882077, at *1 (C.D. Cal. Oct. 8, 2019). "Once service is challenged, [the] plaintiff[] bear[s] the burden of establishing that service was valid under Rule 4." Brockmeyer v. May, 383 F.3d 798, 801 (9th Cir. 2004). "A signed return of service constitutes prima facie evidence of valid service which can be overcome only by strong and convincing evidence." SEC v. Internet Sols. for Bus. Inc., 509 F.3d

1161, 1166 (9th Cir. 2017) (internal quotations omitted); see also Jones v. James Trading Co., 2019 WL 6354392, at *3 (C.D. Cal. July 3, 2019) ("A motion to dismiss under Rule 12(b)(5) requires defendant to produce affidavits, discovery materials, or other admissible evidence establishing the lack of proper service.").

**C.      Rule 12(b)(6)**

Under Rule 12(b)(6), a party may bring a motion to dismiss for failure to state a claim upon which relief can be granted.  Rule 12(b)(6) must be read in conjunction with Rule 8(a), which requires a "short and plain statement of the claim showing that a pleader is entitled to relief," in order to give the defendant "fair notice of what the claim is and the grounds upon which it rests."  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007); see Ileto v. Glock Inc., 349 F.3d 1191, 1199-1200 (9th Cir. 2003).  When evaluating a Rule 12(b)(6) motion, a court must accept all material allegations in the complaint—as well as any reasonable inferences to be drawn from them—as true and construe them in the light most favorable to the non-moving party.  See Doe v. United States, 419 F.3d 1058, 1062 (9th Cir. 2005); ARC Ecology v. U.S. Dep't of Air Force, 411 F.3d 1092, 1096 (9th Cir. 2005); Moyo v. Gomez, 32 F.3d 1382, 1384 (9th Cir. 1994).  Courts are not required, however, "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."  In re Gilead Scis. Sec. Litig., 536 F.2d 1049, 1055 (9th Cir. 2008) (internal citation and quotation omitted).  Courts also need not accept as true allegations that contradict facts which may be judicially noticed.  See Mullis v. U.S. Bankr. Court, 828 F.2d 1385, 1388 (9th Cir. 1987).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  Twombly, 550 U.S. at 555 (citations omitted).  Rather, the allegations in the complaint "must be enough to raise a right to relief above the speculative level."  Id.

To survive a motion to dismiss, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face."  Id. at 570; Ashcroft v. Iqbal, 556 U.S. 662 (2009).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully.  Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it stops short of the line between possibility and plausibility of 'entitlement to relief.'"  Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 556). The Ninth Circuit has clarified that (1) a complaint must "contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively," and (2) "the factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation."  Starr v. Baca, 652 F.3d 1202, 1216 (9th Cir. 2011).

//

**D.      Rule 12(f)**

Under Rule 12(f) of the Federal Rules of Civil Procedure, a district court "may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f).  "The function of a 12(f) motion to strike is to avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with those issues prior to trial."  Whittlestone, Inc. v. Handi–Craft Co., 618 F.3d 970, 973 (9th Cir. 2010) (internal quotation marks omitted).  "Where the complaint demonstrates that a class action cannot be maintained on the facts alleged, a defendant may move to strike class allegations prior to discovery."  Sanders v. Apple Inc., 672 F. Supp. 2d 978, 990 (N.D. Cal. Jan. 21, 2009).  Motions under Rule 12(f) are "generally regarded with disfavor because of the limited importance of pleading in federal practice[.]"  Neilson v. Union Bank of Cal., N.A., 290 F. Supp. 2d 1101, 1152 (C.D. Cal. 2003).  A court has discretion in determining whether to strike matter from a pleading.  Fantasy, Inc. v. Fogerty, 984 F.2d 1524, 1528 (9th Cir. 1993), rev'd on other grounds, 510 U.S. 517 (1994).

**E.      Rule 15**

Rule 15 provides that leave to amend "shall be freely given when justice so requires."  Fed. R. Civ. P. 15(a).  The Ninth Circuit has held that "'[t]his policy is to be applied with extreme liberality.'"  Eminence Cap., L.L.C. v. Aspeon, Inc., 316 F.3d 1048, 1051 (9th Cir. 2003) (quoting Owens v. Kaiser Found. Health Plan, Inc., 244 F.3d 708, 712 (9th Cir. 2001)).  Generally, a "district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by allegation of other facts."  Lopez v. Smith, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (citation omitted).

### IV.     DISCUSSION

**A.      Anker Motion**

Anker moves to dismiss Plaintiffs' TAC on the following grounds: (1) Anker was not properly served in this action; (2) Anker is not subject to personal jurisdiction in California; (3) the Section 15(b) claim fails on the merits; and (4) the Section 15(a) claim fails on the merits.  (See Anker Motion.)  In the alternative, Anker requests that the Court strike Plaintiffs' class allegations.  (See id.)  The Court addresses these arguments in turn.

**1.  Service of Process**

Anker renews its argument that it was not properly served with the SAC—the complaint that added Anker as a defendant in this action—recognizing that the Court has previously ruled otherwise.  (See Anker Motion at 7-8; Defendants' MTD Order at 8-10.)  Plaintiffs argue that Anker provides no new reason why this Court's previous decision should be displaced, and thus Anker has been properly served.  (See Opposition at 15.)  The Court agrees with Plaintiffs.

Rule 4(h) governs service on foreign corporations. Fed. R. Civ. P. 4(h); see Tacori v. Nile, 2023 WL 3555494, at *2 (C.D. Cal. Feb. 23, 2023). It allows for domestic service "by delivering a copy of the summons and of the complaint to an officer, a managing or general agent, or any other agent authorized by appointment or by law to receive service of process." Fed. R. Civ. P. 4(h)(1)(B). A corporation may also be served under Rule 4(e)(1), which governs service of individuals. Fed. R. Civ. P. 4(h)(1)(A). Rule 4(e)(1) provides that service can be effected by following the state law for service of summons in the state where the district court is located. Fed. R. Civ. P. 4(e)(1). The California Code of Civil Procedure provides that process may be served on a corporation "by delivering a copy of the summons and the complaint . . . [t]o . . . a general manager, or person authorized by the corporation to receive service of process." Cal. Code Civ. P. § 416.10(b); see Khachatryan v. Toyota Motor Sales, U.S.A., Inc., 578 F. Supp. 2d 1224, 1226 (C.D. Cal. 2008).

A "general manager" under the California statute has been interpreted to "include [] any agent of the corporation of sufficient character and rank to make it reasonably certain that the defendant will be apprised of the service made." Gray v. Mazda Motor of America, Inc., 560 F. Supp. 2d 928, 930 (C.D. Cal. 2008) (internal quotations omitted). For instance, a court held that a California corporation was the general manager of two New York companies because it was affiliated with the companies and was "the intended outlet for [their] product." See Overland Machined Products, Inc. v. Swingline, Inc., 224 Cal. App. 2d 46, 47-48 (1964). Similarly, in Yamaha Motor Co., Ltd. v. Superior Court, the California Court of Appeal found that an American subsidiary was the "general manager" of a Japanese manufacturer, because the subsidiary had an exclusive arrangement to sell the manufacturer's products, received complaints about the products, and provided marketing for the products. 174 Cal. App. 4th 264, 274 (2009). The Hague Convention requirements apply only "[i]f the internal law of the forum state [California] defines the applicable method of serving process as requiring the transmittal of documents abroad." Volkswagenwerk Aktiengesellschaft v. Schlunk, 486 U.S. 694, 700 (1988). In Yamaha, because California's method of serving process did not require the transmittal of documents abroad, but instead allowed for service on an American general manager, the requirements of the Hague Convention did not apply. See Yamaha, 174 Cal. App. 4th at 274. Generally, "the bar for showing that an entity [is] a general manager is exceedingly low." Tacori, 2023 WL 3555494, at *3.

Here, Plaintiffs submit a signed proof of service indicating that they served the SAC on Fantasia. ("Proof of Service," Dkt. No. 29); see SEC, 509 F.3d at 1166 ("A signed return of service constitutes prima facie evidence of valid service which can be overcome only by strong and convincing evidence."). It is undisputed that Fantasia is Anker's "wholly owned subsidiary" and is "under the control and direction of [Anker]." (SAC ¶ 16; TAC ¶ 16.) Fantasia also "markets and distributes various electronic devices under" Anker's brand. (SAC ¶ 16; TAC ¶ 16.) Like the subsidiary in Yamaha, Fantasia has an arrangement to sell Anker's products, markets Anker's brand, and distributes Anker's products. See Yamaha, 174 Cal. App. 4th at 274. Given the "exceedingly low" threshold to show that an entity is a general manager, the Court finds that Plaintiffs have established that Fantasia is a general manager for Anker. See Tacori, 2023 WL 3555494, at *3. Accordingly, Plaintiffs have properly served Anker by serving the SAC

on Fantasia, and the requirements of the Hague Convention do not apply.  See Khachatryan, 578 F. Supp. 2d at 1228 ("Since Khachatryan served Toyota Japan under California law in a manner which did not require the 'transmittal of documents abroad,' the Hague Convention does not apply in this instance.").

Moreover, Plaintiffs properly served the TAC on Anker because a party can effectuate service of an amended pleading if it is filed in a court's electronic-filing system, provided that the service complies with the relevant rules and procedures for electronic service.  Fed. R. Civ. P. 5(b)(2)(E) (a paper is served by "sending it to a registered user by filing it with the court's electronic-filing system or sending it by other electronic means that the person consented to in writing").

**2. Personal Jurisdiction**

Anker next argues that the TAC should be dismissed as against Anker for lack of personal jurisdiction.  (See Anker Motion at 8-13.)  On this, the Court agrees.  The Court may exercise personal jurisdiction over Anker if it has sufficient "minimum contacts" with California.  See Int'l Shoe Co., 326 U.S. at 316.  Neither party contends that the Court has general jurisdiction over Anker—instead, Plaintiffs argue that the Court has specific jurisdiction over Anker.  (See Anker Motion at 8 n.1; Opposition at 3-8.)  The Ninth Circuit has established a three-prong test for analyzing a claim of specific jurisdiction: "(1) the defendant must either purposefully direct his activities toward the forum or purposefully avail himself of the privileges of conducting activities in the forum; (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and (3) the exercise of jurisdiction must comport with fair play and substantial justice." Axiom Foods, Inc. v. Acerchem Int'l, Inc., 874 F.3d 1064, 1068 (9th Cir. 2017).  "The plaintiff has the burden of proving the first two prongs." Picot v. Weston, 780 F.3d 1206, 1211 (9th Cir. 2015). "If the plaintiff meets that burden, the burden then shifts to the defendant to present a compelling case that the exercise of jurisdiction would not be reasonable." Axiom Foods, 874 F.3d at 1068–69 (internal quotations omitted).

Although the first prong of the three-prong test encompasses two distinct concepts, "[a]t bottom, both purposeful availment and purposeful direction ask whether defendants have voluntarily derived some benefit from their interstate activities such that they will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts." See Herbal Brands, Inc. v. Photoplaza, Inc., 72 F.4th 1085, 1090 (9th Cir. 2023), cert. denied, 144 S. Ct. 693, 217 L. Ed. 2d 389 (2024).  Whether the Court analyzes a defendant's contacts under the purposeful-direction or -availment test typically "turns on the nature of the underlying claims." Impossible Foods Inc. v. Impossible X LLC, 80 F.4th 1079, 1088 (9th Cir. 2023).  However, the Ninth Circuit recently recognized that precedent "do[es] not impose a rigid dividing line between purposeful availment and purposeful direction." Id. at 1088-89 (internal quotations omitted).  There is "no need to adhere to this iron-clad doctrinal dichotomy in every case." Id. at 1089 (internal quotations omitted).

First, the parties dispute whether the purposeful-direction or -availment test applies to this case.  (See Anker Motion at 9-11; Opposition at 3-4.)  Plaintiffs assert that the proper test is purposeful availment, arguing that the Court previously found Yamashita instructive and applied its purposeful-availment standard.  (See Opposition at 3-4; Defendants' MTD Order at 10-11); 62 F.4th 496, 504 (9th Cir. 2023).  Conversely, Anker argues that the Ninth Circuit has held that where a plaintiff asserts an "intentional" tort, the plaintiff must satisfy the purposeful-direction test for personal jurisdiction.  (See Anker Motion at 9); Herbal Brands, 72 F.4th at 1090.  Notably, Anker asserts that several Illinois courts have applied the purposeful-direction test when assessing personal jurisdiction for similar BIPA claims.  (See Anker Motion at 9.)

The Court is not convinced that BIPA claims are intentional torts which must be evaluated under the purposeful-direction test.  Anker cites to two Illinois district court cases to contend that BIPA claims are analogous to intentional torts, and therefore are properly analyzed under the purposeful-direction test.  (See Anker Motion at 9); see also McGoveran v. Amazon Web Servs., Inc., 488 F. Supp. 3d 714, 723 (S.D. Ill. 2020); Brown v. AS Beauty Grp. LLC, 2024 WL 2319715, at *2 (N.D. Ill. May 22, 2024).  But Illinois courts are not in agreement on this question.  See Howell v. Bumble, Inc., 2023 WL 6126492, at *9 (N.D. Ill. Sept. 19, 2023) ("Defendants cite no Seventh Circuit case holding that BIPA claims must be evaluated under purposeful direction only . . . courts in this district regularly evaluate personal jurisdiction in BIPA cases in terms of purposeful availment"); see also Dzananovic v. Bumble, Inc., 2023 WL 4405833, at *3–4 (N.D. Ill. July 7, 2023) (assessing personal jurisdiction over BIPA claims under the purposeful-availment test).

Moreover, the Ninth Circuit has not clearly established that invasion of privacy claims like BIPA should be considered intentional torts.  In Briskin v. Shopify, Inc., the Ninth Circuit concluded that data privacy claims "sound classically in tort and are most naturally analyzed under the purposeful direction framework."  87 F.4th 404, 412 (9th Cir. 2023).  However, the Briskin decision has since been vacated by the Ninth Circuit on grant of rehearing en banc—therefore, it is no longer binding authority.  See Briskin v. Shopify, Inc., 101 F.4th 706 (9th Cir. 2024); Ninth Cir. Rules, Cmt. (2) to Rules 40-2-3 ("When the Court votes to rehear a matter en banc, the Chief Judge will enter an order so indicating . . . . The three-judge panel opinion is vacated, subject to reinstatement by the en banc Court.")

Anker further asserts that because Plaintiffs' claims are premised on purportedly "intentional" violations of BIPA, they qualify as "intentional torts" for jurisdictional purposes.  (See Anker Motion at 9.)  However, Plaintiffs' Sections 15(a) and (b) claims are premised on "intentional *and/or reckless* violation[s] of BIPA."  (See TAC ¶¶ 95, 102 (emphasis added); Opposition at 4.)  As such, the Court finds that Yamashita is still instructive and applies the purposeful-availment test to assess whether this Court has personal jurisdiction over Anker.  (See Defendants' MTD Order at 10-11); 62 F.4th at 504.

It is undisputed that Anker imports its products through the ports of Los Angeles and Long Beach, and they are then distributed by Fantasia, which is located within this District.  (See TAC ¶¶ 22-28.)  In Yamashita, the court considered whether a foreign corporation purposefully

availed itself of Hawaii's laws by shipping its products "to and through the port of Honolulu." Id. The court held that the shipment contacts "[did] qualify as purposeful availment," because the corporation "relied on the laws of Hawaii to protect their property while it was located within its jurisdiction." Id. Here, Anker shipped its products to and through the ports of Los Angeles and Long Beach, within this District. (See TAC ¶¶ 22-28.) Given Yamashita's clear holding that shipments to a port in a forum constitute purposeful availment, this Court must find the same. Anker purposefully availed itself of California's forum and, as such, Plaintiffs have established the first prong of the specific jurisdiction test.

Second, Plaintiffs must demonstrate that their claims "arise[] out of or relate[] to [Anker's] forum-related activities." Axiom Foods, Inc., 874 F.3d at 1068. In Ford, the Supreme Court clarified that "arise out of" and "relate to" are alternatives: for a claim to arise out of a defendant's forum contacts, it requires "but-for" causation, while a claim can relate to those contacts even absent causation. See Ford Motor Company v. Montana Eighth Judicial District Court, 592 U.S. 351, 352-53 (2021); see also Yamashita, 62 F.4th at 504-05 (interpreting Ford).

Here, Plaintiffs appear to concede that their claims do not relate to Anker's forum-related activities because they do not address Anker's arguments on this point. (See Opposition); See Tyler v. Travelers Com. Ins. Co., 499 F. Supp. 3d 693, 701 (N.D. Cal. 2020) ("Plaintiff concedes these arguments by failing to address them in her opposition."); Conservation Force v. Salazar, 677 F. Supp. 2d 1203, 1211 (N.D. Cal. 2009) ("Where plaintiffs fail to provide a defense for a claim in opposition, the claim is deemed waived."). Additionally, the Court previously held—and still holds—that because Plaintiffs' alleged injury occurred outside of California and outside this District, the relationship between Anker's contacts with the forum state and Plaintiffs' claims is too attenuated to support a showing of relatedness. (See Defendants' MTD Order at 11-12.) As such, the Court will only assess whether Plaintiffs' claims arise out of Anker's forum-related activities.

Plaintiffs have not established but-for causation. They allege two contacts within the meaning of the specific personal jurisdiction test: the use of the ports of Los Angeles and Long Beach, within this District; and the distribution of the products by Anker's subsidiary, also within this District. (See TAC ¶¶ 22-23.) However, Plaintiffs do not—and likely cannot—adequately allege that Anker shipped the *specific* cameras that form the basis of their claims into this District's ports. (See id.) Plaintiffs' TAC asserts that based on an aggregator of publicly available bills of lading, "all, or at least the vast majority, of the specific eufy cameras that collected facial geometry scans of each of the Plaintiffs' faces in Illinois were first manufactured overseas by Anker and imported through the Ports of Los Angeles and Long Beach, in this District." (See id. ¶¶ 23-28.) However, the TAC does not allege that the publicly available bills of lading capture the full movements of the types of cameras at issue here. (See TAC; Reply at 4.) As such, because Plaintiffs have failed to establish—as it cannot easily be made here—that Anker's activity in California necessarily caused the introduction of the eufy cameras in question into Illinois, Plaintiffs have not established but-for causation. See Yamashita, 62 F.4th at 506 (holding that the plaintiff did "not establish but-for causation because [the plaintiff did] not allege that LGC or LGCA shipped the subject battery into the port of Honolulu.").

Third, even if Plaintiffs established but-for causation, exercising specific jurisdiction over Anker does not comport with fair play and substantial justice. The third prong requires the Court to balance seven factors: (1) the extent of the defendant's purposeful availment; (2) the burden on the defendant; (3) conflicts of law between the forum state and the defendant's state; (4) the forum's interest in adjudicating the dispute; (5) judicial efficiency; (6) the plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative forum. See Roth v. Garcia Marquez, 942 F.2d 617, 623 (9th Cir. 1991). After balancing these factors, the Court finds that they weigh against exercising specific jurisdiction over Anker. Specifically, the extent in which Anker availed itself of the privilege of doing business in California is slight. Were it otherwise, "[e]very seller of chattels would in effect appoint the chattel his agent for service of process," and "[h]is amenability to suit would travel with the chattel"—an outcome the Supreme Court viewed as intolerable. See World-Wide Volkswagen, 444 U.S. 286, 296 (1980); (Reply at 6.) Further, Plaintiffs are not California residents, and the TAC asserts alleged violations of Illinois law—rendering "California's legitimate interests in the dispute [] considerably diminished." See Asahi Metal Indus. Co. v. Superior Ct. of California, Solano County, 480 U.S. 102, 114 (1987) ("The Supreme Court of California [has] argued that the State ha[s] an interest in 'protecting its consumers by ensuring that foreign manufacturers comply with the state's safety standards.'"). World-Wide Volkswagen also admonished courts to take into consideration the interests of "several States," in addition to the forum State, in the efficient judicial resolution of the dispute and the advancement of substantive policies. See 444 U.S. at 292. Last, Illinois district courts may serve as alternative forums, and it would be inconvenient to haul Plaintiffs—residents of and delivery drivers in Illinois—and potential witnesses to California for purposes of litigating this action.

Accordingly, the Court holds that it lacks personal jurisdiction over Plaintiffs' claims against Anker. The Court **GRANTS** the Anker Motion and **DISMISSES** the TAC as against Anker **WITHOUT LEAVE TO AMEND**.

Because the Court dismisses Plaintiffs' claims against Anker for lack of personal jurisdiction, it need not address whether the claims fail on the merits, and Anker's request to strike class allegations.

**B.     Fantasia Motion**

Fantasia moves to dismiss Plaintiffs' BIPA Section 15(b) and Section 15(a) claims on the merits, and it argues: (1) Plaintiffs' Section 15(b) claim fails because Plaintiffs do not allege that Fantasia itself collected, captured, or obtained their biometric data, and do not allege the existence of any "biometric identifier"; and (2) Plaintiffs' Section 15(a) claim fails for the same reasons. (See Fantasia Motion.) In the alternative, Fantasia requests that the Court strike Plaintiffs' class allegations. (See id.) The Court addresses these arguments in turn.

//
//

1. **BIPA Section 15(b) Claim**

    a. **Collected, Captured, or Obtained Biometric Identifiers**

The Court, in part, granted Defendants' MTD on the basis that Plaintiffs failed to plead that Fantasia collected, captured, or obtained their biometric identifiers. (See Defendants' MTD Order at 13-14.) Under BIPA, Plaintiffs must plead that Fantasia "collect[ed], captur[ed], purchas[ed], receiv[ed] through trade, or otherwise obtain[ed] a person's or a customer's biometric identifier or information." 740 ILCS 14/15(b). "BIPA does not define 'collect,' but courts have held that collection requires more than mere possession." Theriot v. Louis Vuitton North America, 645 F. Supp. 3d 178, 183 (S.D.N.Y. 2022). "[F]or an entity to 'collect,' biometric data, it must take an 'active step,' towards that collection." Id. (citing Naughton v. Amazon.com, Inc., 2022 WL 19324, at *3 (N.D. Ill. Jan. 3, 2022); Namuwonge v. Kronos, Inc., 418 F. Supp. 3d 279, 286 (N.D. Ill. 2019)). Courts have held that it is insufficient to plead that biometric data is captured or collected "on the user's own device"—instead, Plaintiffs must plead that the biometric identifiers are collected "on the defendant's device." See Barnett v. Apple, 225 N.E.3d 602, 611 (Ill. 2022). Examples of active steps include: inviting customers to use a tool that collects biometric identifiers; or uploading biometric identifiers to a defendant's cloud storage. See Theriot, 645 F. Supp. 3d at 183; Sloan v. Anker Innovations Limited, 2024 WL 835426, at *3 (N.D. Ill. Jan. 9, 2024); Karling v. Samsara, Inc., 610 F. Supp. 3d 1094, 1103-04 (N.D. Ill. 2022) (holding that the plaintiff sufficiently alleged the defendant's active collection of data because the defendant collected and stored the biometric data in its cloud-based dashboard).

In the FAC and SAC (and the sources it incorporated by reference), Plaintiffs did allege that Anker "was sending data from its cameras to the cloud." (See FAC ¶¶ 37-39; SAC ¶¶ 49-53.) The Court has previously asserted that "[w]ere Anker a defendant in this action, the allegations that biometric identifiers were sent from [e]ufy cameras to Anker/[e]ufy's cloud server would likely suffice to plead an 'active step' towards collection, as BIPA requires." (Fantasia's Second MTD Order at 11; Defendants' MTD Order at 13.) However, nowhere in the FAC or SAC did Plaintiffs plead Fantasia itself took any "active step" towards collecting their biometric identifiers. (See FAC; SAC; Fantasia's Second MTD Order at 11; Defendants' MTD Order at 13.) The Court also cited cases in which plaintiffs did not have to plead that Fantasia itself took an "active step" because they asserted claims against **both** Fantasia and Anker, and they asserted that the defendants collectively took an "active step" towards data collection. (See Fantasia's Second MTD Order at 11; Defendants' MTD at 13.) As such, the precise roles of each defendant were "factual questions to be resolved later in the litigation." Theriot, 645 F. Supp. 3d at 184.

However, as discussed above, this Court cannot exercise personal jurisdiction over Anker. As such, Fantasia is, again, the only defendant in this action, and Plaintiffs find themselves in the same position as they did during Fantasia's Second MTD and Defendants' MTD. Fantasia argues that Plaintiffs have not sufficiently pled that it collected, captured, or obtained their biometric identifiers. (Fantasia Motion at 19-11.) The Court agrees. Plaintiffs'

TAC repeats the same allegations as the SAC and the FAC. (See TAC ¶¶ 54-58 (alleging that there was "one [eufy] device, the Video Doorbell Dual" that sent images and facial recognition data to a secure cloud operated by Anker); SAC ¶¶ 49-53 (alleging same); FAC ¶¶ 37-39 (alleging same).) Similarly, Plaintiffs' Opposition reassert the same arguments that the Court has repeatedly rejected when dismissing Plaintiffs' Section 15(b) claim against Fantasia. (See Opposition at 11-12; Fantasia's Second MTD Order at 11; Defendants' MTD Order at 13-14.) For instance, Plaintiffs again argue that to get from "Point A (the eufy camera) to Point B (the owner's smartphone app), these facial thumbnails necessarily needed to be collected, captured, and obtained"—allegations that are insufficient to establish that Fantasia itself collected, captured, or obtained these thumbnails. (See Opposition at 12; "Fantasia Second MTD Opposition," Dkt. No. 19 at 12-13; "Defendants' MTD Opposition," Dkt. No. 30 at 11.)

In their Opposition, Plaintiffs also cite to a recently decided case to support their allegation that Fantasia collected their biometric data. (See Opposition at 12 (citing Tibbs v. Arlo Techs., Inc., 2024 WL 3218650, at *8 (N.D. Cal. June 27, 2024)).) However, Arlo is distinguishable from this case because the plaintiffs pled that the defendant "store[d] the[ir] [biometric] scans in an electronic database" and the district court reasonably presumed that the **sole** defendant "d[id] not merely mysteriously end up in possession of the [biometric] scans, but rather is the entity capturing the biometric information at issue." See Arlo Techs., Inc., 2024 WL 3218650, at *8. The Court cannot make the same presumption as the district court in Arlo because Anker could have exclusively collected the biometric data at issue, which—at minimum—the TAC affirmatively alleges. See id.; (TAC ¶¶ 54-58.)

### b. Biometric Identifiers

Fantasia further argues that the TAC does not allege the existence of any "biometric identifier" that could trigger an obligation for Fantasia under Section 15(b). (See Fantasia Motion at 6.) Plaintiffs allege that Defendants stored facial thumbnails—i.e., biometric identifiers—from the eufy devices to a secure cloud. (See TAC ¶ 58; Opposition at 8-10.) BIPA defines a biometric identifier as a "retina or iris scan, fingerprint, voiceprint, or scan of hand or face geometry." 740 ILCS 14/10; see also Clarke v. Aveda Corporation, 2023 WL 9119927, at *2 (N.D. Ill. Dec. 1, 2023). In Zellmer, the Ninth Circuit clarified that "the ordinary meaning of 'identifier'—since it has an -er suffix—is 'one that identifies.'" Zellmer v. Meta Platforms, Inc., 104 F.4th 1117, 1124 (9th Cir. 2024). "In other words, if . . . biometric data cannot identify an individual, it is not an identifier and thus not covered by BIPA." Id. at 1123 (accepting defendant's argument on same).

Both parties heavily rely on Zellmer and Arlo to argue whether Plaintiffs' thumbnail photos are biometric identifiers for BIPA purposes. (See Fantasia Motion; Opposition; Reply); Zellmer, 104 F.4th; Arlo Techs., Inc., 2024 WL 3218650. Although the Court finds both cases instructive, it also finds that Plaintiffs' allegations are dissimilar to the facts of Zellmer and the allegations asserted in Arlo.

//

In Zellmer, on review of summary judgment, the Ninth Circuit concluded that Meta's "Tag Suggestions" feature—which generated a "face signature" from an image, that was then compared to "face templates" created from other images uploaded to Facebook to determine whether the faces were a "match"—did not collect or capture biometric data. See 104 F.4th at 1125-26. "Put differently, the recognizable indicator allows Meta only to identify that a particular image contains a face. But this does not mean that Meta can, from that face, identify a person." Id. at 1126. Specifically, the Ninth Circuit premised its holding on the fact that face signatures (1) "d[id] not—and cannot—reveal information about a ***face's geometric information*** . . . [a]nd they neither reveal ***facial features nor the distances between them***"; (2) "are simply numbers—an abstract, numerical representation of the aligned face crop created in previous stages"; and (3) "exist for only a tiny fraction of a second—they are neither saved nor stored after the final stage of the Tag Suggestions process." See id. at 1120–21 (emphasis added).

In Arlo, a district court, distinguishing Zellmer, found plaintiffs' allegations sufficient to establish at the pleading stage that the scans defendant captured are biometric identifiers for purposes of BIPA's regulations. Arlo Techs., Inc., 2024 WL 3218650, at *7. For this conclusion, the district court relied on plaintiffs' allegation that "[defendant] ha[d] explained in a European patent that its face recognition technology can identify a specific person at a door and send a user a message such as 'Mary detected at front door' or, conversely, inform a user of 'Unknown person at front door.'" See id. Notably, plaintiffs further alleged that "[d]efendant's cameras collected [p]laintiffs' ***face geometry*** and stored the image of [p]laintiffs' ***face geometry*** in an electronic database whenever [p]laintiffs made deliveries to homes equipped with defendant's cameras." See id. (emphasis added).

In Zellmer and Arlo, the courts considered whether plaintiffs' facial geometry, facial features, and/or the distances between their facial features were saved, stored, or captured by defendants to determine whether the plaintiffs properly asserted or alleged the existence of biometric identifiers. Here, Plaintiffs allege that eufy's AI technology "scan[s] a human face or an image thereof, extract[] facial feature data based on specific identifiers, and compar[e] the resulting 'face template' (or 'faceprint') against ***templates*** [and/or ***facial thumbnails***] stored in a database." (See TAC ¶¶ 56-59 (emphasis added).) However, nowhere in the TAC did Plaintiffs plead (1) that these templates and/or facial thumbnails contained their facial geometry, facial features, and/or the distances between their facial features[2] or (2) that Fantasia derived facial scans from these templates and/or facial thumbnails. (See TAC); In re Facebook, 185 F. Supp. 3d 1155, 1171 (N.D.Cal. 2016) (finding "digital representation of the face . . . based on

---

[2] The Court recognizes that Plaintiffs allege, in various paragraphs of the TAC, that "[e]ach time Plaintiffs and Class Members made a delivery to Defendants' customers' homes, Defendants' cameras collected Plaintiffs' ***face and/or hand geometry*** and ***stored*** the images of Plaintiffs' ***face and body geometry in an electronic database*** without ever informing Plaintiffs in writing that it was doing so." (See TAC ¶¶ 9, 12-15, 28, 71, 88, 91, 100.) However, the facts alleged in the TAC—e.g., that templates and/or facial thumbnails were stored in a secure cloud—do not support these conclusory allegations. (See TAC ¶¶ 56-59.)

geometric relationship of their facial features" to be a "scan of face geometry"); Vance v. Microsoft Corp., 525 F. Supp. 3d 1287, 1295 (W.D. Wash. 2021) (finding that "facial scans derived from photographs" can qualify as biometric identifiers under BIPA).  Further, it is well-established that photographs such as thumbnails are not biometric identifiers.  See Patterson v. Respondus, Inc., 593 F. Supp. 3d 783, 817 (N.D. Ill. 2022) ("[BIPA] . . . makes clear that a photograph . . . is not itself a biometric identifier, and that information 'derived from' a photograph is not biometric information."); Microsoft Corp., 525 F. Supp. 3d at 1295 ("Biometric identifiers 'do not include . . . photographs . . . .'"); Delgado v. Meta Platforms, Inc., 718 F. Supp. 3d 1146, 1156 (N.D. Cal. 2024) (holding same).

In sum, because Fantasia is currently the only defendant in this action, Plaintiffs must plead that Fantasia took an active step to collect, capture, or obtain their biometric identifiers.  As it stands, Plaintiffs plead only that Anker sent their biometric identifiers to its cloud.  (See TAC ¶¶ 54-58.)  Other courts that addressed similar questions have dismissed Section 15(b) claims where it was unclear how the defendant was involved in the active capture and collection of biometric identifiers.  See Jacobs, 2021 WL 3172967, at *3 (holding that the plaintiff did not plausibly allege the defendant collected or captured biometric data because "a complete reading of the complaint makes clear that defendant is merely a third-party technology provider . . . and that the active collector and processor of the data is T.J. Maxx"); Heard v. Becton, Dickinson & Co., 440 F. Supp. 3d 960, 967 (N.D. Ill. 2020) (dismissing a Section 15(b) claim against a defendant where the plaintiff did not allege "how [or] when" the defendant "collected" the plaintiff's biometric data); Namuwonge v. Kronos, Inc., 418 F. Supp. 3d 279, 286 (N.D. Ill. 2019) (dismissing a Section 15(b) claim because the plaintiff did not plausibly allege that the defendant scanner manufacturer itself "collected, captured, or otherwise obtained [plaintiff's] biometric information").  Moreover, Plaintiffs fail to establish the existence of any biometric identifier that was collected or captured by Fantasia as they do not allege that the templates and/or facial thumbnails allegedly stored in a secure cloud contained scans of their facial geometry.  (See TAC); In re Facebook, 185 F. Supp. 3d at 1171.  Additionally, Plaintiffs do not allege that Fantasia derived biometric scans from these templates and/or facial thumbnails.  (See TAC); Microsoft Corp., 525 F. Supp. 3d at 1295.  At best, Plaintiffs allege that their biometric scans were compared to these templates and/or facial thumbnails, which the Court finds insufficient.  (See TAC ¶¶ 56-59.)  Accordingly, Plaintiffs have not plausibly alleged a Section 15(b) violation against Fantasia.

The Court **GRANTS** the Fantasia Motion as to the Section 15(b) claim and **DISMISSES** the claim **WITHOUT LEAVE TO AMEND**.[3]

//
//
//

---

[3] The TAC represents Plaintiffs' fourth attempt at alleging this claim.  The Court previously warned that a future failure to properly state a Section 15(b) claim will result in dismissal without leave to amend.  (See Defendants' MTD Order at 14.)

//

### 2. BIPA Section 15(a) Claim

BIPA Section 15(a) provides that "[a] private entity in possession of biometric identifiers or biometric information must develop a written policy, made available to the public, establishing a retention schedule and guidelines for permanently destroying biometric identifiers and biometric information." 740 ILCS 14/15(a). Fantasia argues that Plaintiffs fail to allege Fantasia itself possessed any biometric identifiers, for the same reasons as discussed above. (Fantasia Motion at 10-11.)

As explained above, the TAC lacks any allegation that Fantasia, specifically, collected or obtained Plaintiffs' biometric identifiers. (See TAC.) The Court also cannot identify any allegations in the TAC that Fantasia independently possessed Plaintiffs' biometric data. (See id.) Accordingly, the Court finds that Plaintiffs fail to state a claim under BIPA Section 15(a).

The Court **GRANTS** the Fantasia Motion as to the Section 15(a) claim and **DISMISSES** the claim **WITHOUT LEAVE TO AMEND**.[4]

Because the Court dismisses Plaintiffs' claims against Fantasia, it need not address Fantasia's request to strike class allegations.

### V.   CONCLUSION

For the above reasons, the Court **ORDERS** as follows:

1. Defendant Fantasia's motion to dismiss (Dkt. No. 46) is **GRANTED**.

2. Defendant Anker's motion to dismiss (Dkt. No. 47) is **GRANTED**.

3. Plaintiffs' TAC is **DISMISSED WITHOUT LEAVE TO AMEND** as against both Defendants.

4. The Court **VACATES** the February 24, 2025 hearing.

5. The Clerk of the Court is **DIRECTED** to close the case.

**IT IS SO ORDERED.**

---

[4] The TAC represents Plaintiffs' fourth attempt at alleging this claim. The Court previously warned that a future failure to properly state a Section 15(a) claim will result in dismissal without leave to amend. (See Defendants' MTD Order at 15.)